Sandra J. HARTKE, Plaintiff,

v.

Dr. William McKELWAY, Defendant.

Civ. A. No. 79–3447.

United States District Court, District of Columbia.

Oct. 8, 1981.

Wayne Hartke, Falls Church, Va., for plaintiff.

Patrick J. Attridge, Rockville, Md., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

This case is currently before the Court on defendant's motions for judgment notwithstanding the verdict and for a new trial. After considering the submissions of the parties and reviewing the record in this case, and in particular, the transcript of the testimony of Dr. Suryabala Goswami, the Court concludes that the defendant's motions must be granted in part and denied in part, as appears more fully below.

This is what is sometimes known as a "wrongful conception" case. The plaintiff, Sandra Hartke, fearful of becoming pregnant due to previous problems such as an ectopic pregnancy, went to Dr. McKelway, the defendant, for a second opinion on the best method of assuring that she would not become pregnant. It was subsequently discovered that Ms. Hartke was pregnant at the time she consulted Dr. McKelway. On his advice, she agreed to undergo a surgical procedure known as laproscopic cauteriza-tion, which essentially involves the burning of the fallopian tubes. This procedure has a failure rate of between 1 and 3 in 1,000. Nonetheless, there was considerable evidence that defendant told plaintiff that she need not concern herself with the possibility of becoming pregnant in the future once she had this operation. In March 1978, Dr. McKelway performed an abortion to terminate plaintiff's existing pregnancy and performed the laproscopic cauterization in an effort to prevent her from becoming pregnant in the future. Despite the surgery, in September of 1979 plaintiff again became pregnant. She elected to carry this child to term, and in June 1980 gave birth, via a Caesarian section, to a normal baby girl.

Plaintiff presented three theories on which to base recovery in this case: negligence in performing the operation, failure to obtain the patient's informed consent to the procedure performed, and breach of a warranty that plaintiff would not become pregnant. At the close of plaintiff's case, the Court granted the defendant's motion for a directed verdict on the warranty claim, holding that as a matter of law plaintiff had failed to provide sufficient proof that defendant had guaranteed favorable results, in view of the fact that plaintiff signed consent forms which stated that no guarantee of favorable results was given. *See Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977). The Court denied defendant's motions for directed verdict on the negligence and informed consent counts. The case was submitted to the jury with a special verdict form (a copy of which is appended). The jury found for plaintiff on both remaining theories, and awarded her $310,000 in damages, broken down as follows: $10,000 for medical expenses; $100,000 for pain, suffering, and mental anguish; and $200,000 for the future cost of raising the child less the benefits of the child's comfort and society. Defendant renews his motions for directed verdict here, as well as moving for new trial on several grounds. In addition, he asks for judgment on the ground that plaintiff has not stated a claim for relief, and maintains that damages are

not recoverable as a matter of law for the costs of raising a healthy child. The Court will address these contentions in turn.

## I. *Failure to State a Claim*

■ Defendant urges that the Court should not recognize a cause of action where an unplanned conception results from defendant's tortious conduct, but should wait for the legislature to create such a claim. While the District of Columbia courts have yet to confront the issue, the weight of authority in other jurisdictions clearly supports the existence of such a claim as a matter of common law. *See* cases cited in Section IV, *infra.* The cases cited by defendant as denying recovery altogether for wrongful conception in fact deal only with whether certain elements of damages are recoverable, such as the cost of raising a child. *See Coleman v. Garrison,* 349 A.2d 8 (Del.1975); *Terrell v. Garcia,* 496 S.W.2d 124 (Tex.Civ.App.1973), *as clarified in Garwood v. Locke,* 552 S.W.2d 892 (Tex. Civ.App.1977). Since all recent cases appear to contemplate some sort of recovery in tort for negligent failure of a physician to sterilize effectively, the Court concludes that the District of Columbia courts would be likely to follow the clear weight of authority and recognize such a cause of action. *See Julander v. Ford Motor Co.,* 488 F.2d 839 (10th Cir. 1973) (upholding district court determination that Utah courts would follow the weight of authority in adopting strict products liability, despite the fact that they had not yet done so). This is not a case like the collateral estoppel issue in *Gatewood v. Fiat, S. p. A.,* 617 F.2d 820, 826 n.11 (D.C.Cir.1980) where the D.C. courts had addressed the issue and had not yet adopted the trend of the case law; rather, this issue is like the jurisdictional issue in that case, where there was no D.C. case law and the court therefore looked to the law of other jurisdictions. *Id.* at 824–25.

## II. *The Negligence Claim*

In support of his claim that he is entitled to judgment as a matter of law on the negligence claim, defendant points to the general rule that expert testimony is required to support a claim that defendant's conduct did not meet the applicable standard of care. *Robbins v. Footer,* 553 F.2d 123 (D.C.Cir.1977). He also points to the lack of qualifications of the plaintiff's only expert, Dr. Goswami, who is not, as the defendant is, Board certified in obstetrics and gynecology, but rather is a certified Family Practitioner. In response, plaintiff cites the case of *Baerman v. Reisinger,* 363 F.2d 309 (D.C.Cir.1966), which holds generally that a physician is competent to testify even though not a specialist in the field of which she speaks, and that specialization goes to weight rather than admissibility.

Dr. Goswami was invited by plaintiff and admitted by her then doctor (not the defendant) to witness the Caesarian delivery. During this procedure, she literally observed with her eyes the fallopian tubes which had been the object of the unsuccessful sterilization attempt by defendant.

Dr. Goswami received her medical training in India and Great Britain. She did not specialize in obstetrics and gynecology, serving only one year in residency in that field, while three years are required for certification. Transcript of the Testimony of Dr. Goswami at 116–17. While Dr. Goswami has had considerable practice as a result of her Family Practice in the United States from 1971 until present, she has performed no surgical procedure since then. *Id.* at 217. She has never performed the operation in question, has never assisted in the performance of such an operation, and has observed such operations on only two occasions. The Court originally granted plaintiff's motion to qualify Dr. Goswami as an expert.

This decision rested on her training and experience in gynecology and obstetrics in India, England and at the University of Maryland. Her uncontradicted testimony that she performed several hundred tubal ligations, *id.* at 49, coupled with her experience and training in the United States qualified her to testify as to the standard of care in respect of conventional tubal ligations by surgery—actual cutting of the

tube. Any difference between her opinion as to the correct standard and the opinion of other physicians with better or more elegant qualifications would be for the jury. But the evidence as it unfolded indicated that her knowledge of the standard of care in respect of tubal ligations by separation of the fallopian tubes did not extend to knowledge of the standard of care for sterilization by the laproscopic cauterization procedure. She had no training or experience with that procedure. Laproscopic cauterization is relatively new, and the evidence revealed significant differences between the two procedures. Her reading of literature and conferring with other physicians on the eve of trial did not qualify her to testify about the standard of care for laproscopic cauterization. Specifically, she was not able to address with any authority the question of whether the relevant standard of care contemplated the sterilizing effect of cauterizing and thereby congealing a fallopian tube without actually severing it. In fact, she testified that a major reason for her conclusion that there was negligence was that the result was unfavorable. *Id.* at 155–56.

Upon reflection, the Court concludes that although she was competent to testify about her observations, Dr. Goswami was not a qualified expert on the standard of care for laproscopic cauterization procedures. While *Baerman* holds that a doctor need not be a specialist to testify, it does not remove the requirement that, in order to give an opinion on whether the defendant complied with the applicable standard of care, the witness must be familiar with that standard. *Robbins v. Footer, supra.* The trial court must weigh the qualifications of the witness and determine whether or not she is qualified to express an opinion on the subject. *Sher v. DeHaven,* 199 F.2d 777, 782 (D.C.Cir.1952), *cert. denied,* 345 U.S. 936, 73 S.Ct. 797, 97 L.Ed. 1363 (1953). Although her eye-witness account of her observations in the delivery room were essential and admissible, the Court now concludes that Dr. Goswami was not competent to express an opinion on the defendant's due care or lack thereof, and should not have been allowed to testify about the standard of care for laproscopic cauterization.

Moreover, the Court is convinced that its failure to prevent Dr. Goswami from testifying concerning the standard of care was not harmless. Except for the testimony of Dr. McKelway, who was called by the plaintiff and testified that the standard of care required cauterization of both left and right fallopian tubes, Dr. Goswami was plaintiff's only expert. The Court cannot conclude that the jury necessarily would have reached the same result on the negligence issue without the benefit of her opinion. In addition, much of Dr. Goswami's testimony was to the effect that it violated the standard of care for defendant to perform the laproscopic cauterization technique on a patient with a history of peritonitis and on a patient more than twelve weeks pregnant. But the dangers of such violations of the standard of care did not materialize in this case and are concededly causally unrelated to the plaintiff's pregnancy. The Court originally admitted this evidence on the ground that the jury was entitled to know the context in which the operation occurred. It now appears to the Court that the prejudicial effect of this "negligence in the air" testimony outweighed its rather minimal probative value, and that it should have been excluded. This is particularly so where its importance was seemingly highlighted by what the Court has now determined to be an unqualified witness. Accordingly, the jury's verdict that defendant was negligent cannot stand.

The Court concludes nonetheless that there was sufficient evidence of negligence, even without Dr. Goswami's opinion, to create an issue for the jury so that defendant's motion for a judgment notwithstanding the verdict must be denied. The plaintiff called the defendant, Dr. McKelway, and he testified that the standard of care requires some cauterization of the tube so that failure to cauterize one of the plaintiff's fallopian tubes would violate the standard of care. In addition to Dr. McKel-

way's standard of care testimony which required submission of the case to the jury, experts called by the defense confirmed that the standard of care required substantial cauterization of each tube. There was evidence, albeit weak, from which the jury could have concluded that Dr. McKelway failed to cauterize the right tube at all. Dr. Goswami testified that when she observed the plaintiff during her delivery by Dr. Barter in June 1980, plaintiff's right fallopian tube was intact. Even though Dr. Goswami was incompetent to testify concerning the standard of care, she was competent to testify concerning what she observed during plaintiff's subsequent delivery, and that testimony was sufficient to create a jury issue. Defendant's witnesses did not succeed in rebutting plaintiff's evidence of negligence to such an extent that the Court could find that no reasonable jury could have found Dr. McKelway negligent. Accordingly, defendant's motion for judgment notwithstanding the verdict for failure to prove standard of care must be denied.

In view of the foregoing, if the only issue decided by the jury were negligence, the setting aside of the finding and verdict would obviously require a new trial. In this case, however, the Court obtained from the jury a special verdict which found for the plaintiff on both the negligence and the informed consent counts. Since the Court concludes that the informed consent verdict is sound, and since that verdict is sufficient to support the damages awarded, a new trial on the negligence count is unnecessary. Many courts have noted that where a general verdict is returned, a new trial must be ordered if either count must be set aside. This danger was avoided here by use of a special verdict, which, as stated by the Court in *Mueller v. Hubbard Milling Co.*, 573 F.2d 1029, 1038 n. 13 (8th Cir. 1978), "will often obviate the necessity of deciding difficult legal questions which are not essential to an appropriate disposition of the controversy." *See also King v. Ford Motor Co.*, 597 F.2d 436, 439 & n. 2 (5th Cir. 1979); Brown, *Federal Special Verdicts: The Doubt Eliminator*, 44 F.R.D. 245 (1967). The two counts were clearly separated from each other in the instructions, which characterized the informed consent count as "another issue" after the negligence instructions.

As discussed below in Section III, expert testimony is not necessary or even particularly relevant on the issue of whether or not the physician adequately disclosed the risks of the operation to the patient. *Canterbury v. Spence*, 464 F.2d, 772, 791–92 (D.C.Cir. 1972). While expert testimony is required to establish what the risks are—*id.*—Dr. McKelway himself provided that information. The Court is satisfied that Dr. Goswami's testimony did not prejudice the defendant on the informed consent count, and that it is therefore unnecessary to order a new trial on the negligence count. Should the Court of Appeals reverse this Court's decision on the informed consent count, however, then a retrial on negligence would be in order. Accordingly, defendant's motion for a new trial is denied. If the Court of Appeals reverses this Court's judgment on the informed consent count, defendant's motion is granted.

### III. *The Informed Consent Claim*

Defendant makes essentially two attacks on the finding of the jury that he did not adequately inform her of the risks of pregnancy of this procedure, estimated by various witnesses at between 1 and 3 in 1,000. First, defendant contends that in view of plaintiff's strongly expressed desires to be sterilized and the risks associated with various alternatives, reasonable persons could only conclude that the risks involved here were immaterial. Even though the risks were small, however, the defendant was on notice that plaintiff had a great anxiety about any possible future pregnancy, and indeed could possibly have died from a future pregnancy. In the District of Columbia, the relevant standard of materiality is expressed in *Canterbury v. Spence, supra*, at 787: "a risk is material when a reasonable person in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in decid-

ing whether or not to forego the proposed therapy." There is ample evidence from which a jury could conclude that a reasonable person in plaintiff's position would have considered important even a relatively small chance of pregnancy.

■ Defendant's second contention on this issue is that no proximate causation has been shown as there is no evidence that plaintiff would have foregone the surgery had she been informed of the risks. He points to a statement in *Henderson v. Milobsky*, 595 F.2d 654, 658 (D.C.Cir.1978) to the effect that where claimant has not asserted that had she known of the risk she would not have undergone the treatment, the issue of causation cannot go to the jury. Defendant asserts that plaintiff never stated in her testimony that she would have avoided the operation had she known of the risks. This Court does not interpret *Henderson, supra,* to require that plaintiff make this assertion *in haec verba,* as long as there is sufficient evidence from which the jury could infer that she would have refused. There is ample evidence to that effect here. For example, plaintiff's husband testified that had he known of the risks of pregnancy, he would have undergone a vasectomy. To require plaintiff herself to make this assertion in a case such as this when her husband testifies to this effect in her presence would only set a trap for the unwary. The Court is satisfied that there was evidence from which the jury could find that plaintiff would have declined the procedure had she been informed of the risks. Defendant's motion for judgment notwithstanding the verdict on the informed consent count is denied.

■ Defendant raises a number of contentions of prejudice from plaintiff and her counsel's conduct during the trial which are relevant to a motion for new trial on both counts. These include allegations that plaintiff's crying on the witness stand, questioning about defects in hospital records, statements about absent witnesses

and various other allegedly inflammatory remarks made by plaintiff's counsel prejudiced the jury against the defendant. The Court is satisfied that any prejudice was cured by instructions to the jury to disregard such statements. In addition, defendant's counsel himself stated in closing argument that plaintiff was blackmailing defendant and that plaintiff and her family only wanted money, statements with at least as much prejudicial potential as any made by plaintiff. Defendant's motion for new trial on these grounds is denied.

■ Finally, defendant argues that he is entitled to a new trial·because he was not allowed to reopen discovery to depose Dr. Goswami. The Court notes that defendant was informed that Dr. Goswami was a potential witness some two weeks before discovery ended and did not seek to depose her then. Despite this fact, the Court allowed defendant an extensive *voir dire,* in the nature of a deposition, before Dr. Goswami testified. The Court is satisfied that no prejudice to the defendant on the informed consent issue resulted from his inability to depose Dr. Goswami, and since the Court has decided to set aside the negligence verdict should the informed consent judgment be reversed, it is unnecessary to decide whether defendant was unduly prejudiced on the negligence count.

Accordingly, defendant's motion for new trial on this ground is also denied.

## IV. *Damages*

The Court was aware before the trial of this case began that there is a sharp division of authority among various courts on the issue of what damages are recoverable in wrongful conception cases such as the present one.[1] Accordingly, the Court submitted the case to the jury with a special verdict form which required the jury to separate the damages awarded into medical expenses; pain, suffering, and mental anguish; and the cost of raising the child less an offset for the benefits of the child's comfort and society. In so doing, the Court

1. Although many of the cases cited *infra* involved wrongful failure to abort, the issues are essentially the same.

intended to avoid a possible retrial if its determination of what damages were recoverable in a case such as this were later reversed.

▇▇ Defendant challenges the sufficiency of the evidence with respect to all three elements of damages. On the medical expense portion, defendant points out that there is no evidence to support expenses greater than $6,000, the amount claimed in plaintiff's closing argument. Plaintiff claims that the jury may have estimated future medical expenses to arrive at the $10,000 figure. However, there is no evidence to support a finding of future medical expenses. Accordingly, the Court will grant defendant's motion for new trial limited to the amount of plaintiff's medical expenses, unless plaintiff agrees to remit $4,000.

▇▇ Defendant claims that the amount of $100,000 for pain, suffering, and mental anguish is excessive. While the figure is high, the Court concludes that it is not so excessive as to require the Court to set it aside, in view of plaintiff's testimony concerning her fear of pregnancy and the obvious effects which her experience has had on her, which were corroborated by several of plaintiff's witnesses. Defendant himself admitted that plaintiff was very frightened about the possibility of pregnancy when she came to him for advice on how best to avoid it. The Court will not disturb the jury's verdict on this issue.

Finally, defendant objects to the awarding of the costs of raising plaintiff's healthy child as an element of damages. On the issue of whether such damages are recoverable, the courts are almost evenly divided. Approximately one-half of the courts which have reported such cases award such damages, reasoning that plaintiff should be compensated for all damages which result from the defendant's tort and the burden of any uncertainty in damages should fall on the defendant.[2] Others deny recovery, holding that public policy dictates a finding that the costs of raising a child are offset by the benefits of its society and comfort, and that at any rate it is unjust to place on the physician the entire cost of raising the child while plaintiff retains all of the benefits, particularly in view of the plaintiff's choice to keep the child rather than opt for abortion or adoption.[3] Most which allow recovery of child-rearing costs require an offset of the child's society and comfort.[4]

There does not appear to be any indication in the case law of which view is likely to be adopted by the District of Columbia courts. The question, not yet decided in the District of Columbia or at common law in Maryland, is closely balanced and difficult. On one hand there is something inherently distasteful about a holding that a child is not worth what it costs to raise it, and something seemingly unjust about imposing the entire cost of raising the child on the physician, creating in the words of one court "a new category of surrogate parent."[5] On the other hand, the admitted uncertainty of damages should not work to the plaintiff's disadvantage, as the normal rule is to place the burden of uncertainty on the wrongdoer. *See, e. g., Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). And it seems wrong to hold that a child is,

**2.** *See Cockrum v. Baumgartner*, 99 Ill.App.3d 271, 54 Ill.Dec. 751, 425 N.E.2d 968 (1981); *Mason v. Western Pa. Hosp.*, 286 Pa.Super. 354, 428 A.2d 1366 (1981); *Anonymous v. Hospital*, 35 Conn.Supp. 112, 398 A.2d 312 (1979); *Sherlock v. Stillwater Clinic*, 260 N.W.2d 169 (Minn.1977); *Rivera v. State*, 94 Misc.2d 157, 404 N.Y.S.2d 950 (Ct.Cl.1978); *Troppi v. Scarf*, 31 Mich.App. 240, 187 N.W.2d 511 (1971); *Custodio v. Bauer*, 251 Cal.App.2d 303, 59 Cal. Rptr. 463 (1967).

**3.** *See Sorkin v. Lee*, 78 A.D.2d 180, 434 N.Y. S.2d 300 (1980), *appeal dismissed*, 53 N.Y.2d 797 (1981); *Public Health Trust v. Brown*, 388

So.2d 1084 (Fla.App.1980); *Berman v. Allan*, 80 N.J. 421, 404 A.2d 8 (1979); *Wilczynski v. Goodman*, 73 Ill.App.3d 51, 29 Ill.Dec. 216, 391 N.E.2d 479 (1979); *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975); *Coleman v. Garrison*, 349 A.2d 8 (Del.1975); *Reick v. Medical Protective Co.*, 64 Wis.2d 514, 219 N.W.2d 242 (1974).

**4.** *See Troppi v. Scarf, supra*; Restatement (Second) of Torts § 920. *See* verdict form attached hereto.

**5.** *Reick v. Medical Protective Co., supra*, 219 N.W.2d at 244.

as a matter of law, worth the costs of raising her when the parents have chosen differently in deciding against more children.

■ However these factors would be balanced in the more difficult case where the plaintiff originally sought sterilization for economic reasons, that is not this case. The evidence is clear that plaintiff sought sterilization because she had previously suffered an ectopic pregnancy, and feared for her life should she become pregnant again. There is no evidence to support the view that she sought to avoid the expenses of raising another child. Plaintiff is, of course, entitled to be compensated for the physical and mental anguish she suffered as a result of defendant's tort. To allow her to recover in addition the costs of raising this child would be to give her a windfall.

This conclusion is supported by the fact that once she learned that this pregnancy was a normal pregnancy rather than an ectopic one, plaintiff chose not to have an abortion, though during her previous pregnancy she had chosen to terminate the pregnancy. This indicates that her decision to keep the child was not the result of principled objections to abortion. This, along with plaintiff's testimony that she now loves the child and that it is a source of pride and joy to her and her family, convinces the Court that defendant's wrong against plaintiff consisted in imposing the pain, suffering, and mental anguish of a pregnancy on her, not in imposing the costs of a healthy child greatly cherished by its mother. *See Christensen v. Thornby,* 192 Minn. 123, 255 N.W. 620 (Minn.1934), distinguished on this ground in *Troppi v. Scarf,* 187 N.W.2d 511, 514 (Mich.App.1971); Note, *Wrongful Conception: Who Pays for Bringing Up Baby?* 47 Fordham L.Rev. 418, 432–35 (1978). Accordingly, this Court concludes that weight of authority does not, and the District of Columbia courts would not, allow recovery of the costs of raising a healthy child in circumstances such as these where the plaintiff sought sterilization solely for therapeutic reasons, and prizes the child she bore. The case where sterilization is sought for economic reasons is not before the Court.

Finally, the Court must address the issue of what action to take should the Court of Appeals reverse this last determination. *See* Fed.R.Civ.P. 50(c). There is little, if any, support for the $200,000 figure which the jury found to be the cost of raising the child less the offset for benefits. Plaintiff testified that the cost of raising her previous child, born in 1964, was approximately $60,000. In fact, in her pretrial brief, plaintiff estimated her cost of raising *this* child at $60,298. Plaintiff now argues that the jury could have made a rough adjustment for inflation and arrived at a figure of $200,000 based on seventeen years inflation (actually the relevant amount of time is sixteen years: the child is already over one year old). Plaintiff presented no economist, as is the practice in wrongful death cases, nor was there evidence of the reasonableness of the claimed amounts. While defendant could have cross-examined the plaintiff or presented his own evidence on these issues, the Court is nonetheless left with the conviction that the amount of the verdict here is excessive. The interests of justice would best be served, this Court concludes, by a new trial on this issue so that both sides can present evidence on the actual expected costs of raising a child born in 1980, rather than by permitting the existing verdict, which is necessarily found on speculation, to stand.

Accordingly, in an accompanying order, the Court has vacated the $310,000 verdict rendered by the jury in this case. A new trial has been ordered on the issue of the amount of plaintiff's medical expenses, unless plaintiff agrees to remit the excess $4,000. When the amount of those expenses has been determined, judgment for that amount plus $100,000 for pain, suffering, and mental anguish will be entered. Defendant's remaining motions for judgment notwithstanding the verdict and for new trial are denied, except that should the Court be reversed on the informed consent count, then a new trial is granted on the negligence count, and should the Court of Appeals reverse this Court's determination that the cost of raising plaintiff's child is not recoverable, then a new trial is granted limited to the amount of those damages.

## APPENDIX

Has the plaintiff proved that the defendant negligently failed to cauterize her fallopian tubes?

Yes  ☒

No  ☐

Has the plaintiff proved that pregnancy was a material risk following the procedure she underwent, that the defendant failed to inform her of this risk and that had a reasonable person in her circumstances been informed, that person would not have consented to the procedure?

Yes  ☒

No  ☐

If your answer to both questions is "No" proceed no further and inform the Court you have reached a verdict.

If your answer to either or both questions is "Yes", proceed to the next question.

Enter the amount of damages you feel the plaintiff proved she sustained for any or all of the following:

Expenses _____ $ 10,000.00

Pain, suffering, and mental
anguish _____ $100,000.00

Anticipated costs of raising this child until age 18 less any benefit she received or in the future will receive by reason of the love, joy, happiness, etc. she experienced in raising a healthy, happy child.  $200,000.00

Total damages _____ $310,000.00

### II.

#### Verdict Summary

(Complete 1 or 2 but not both)

1.  We, the jury, find for plaintiff in the amount of $310,000.00 (amount should equal total damages from Part I).

2.  We, the jury, find for defendant.  (check box)  ☐.